STATE OF NORTH CAROLINA v. CHRISTOPHER SPICER

No. 25

(Filed 15 May 1974)

1. Criminal Law § 88— cross-examination to show bias — limitation improper

Where a State's witness testified that he shared a cell with defendant and defendant admitted to the witness that he committed the robbery and murder in question, the trial court erred in refusing to allow defendant to cross-examine the witness as to who was paying the living expenses of the witness and his wife, neither of whom was working, and who procured a bond for the witness which was reduced from $5,000 to $400, since that evidence might show the witness's bias and have a bearing on his credibility.

2. Criminal Law §§ 117, 119— accomplice testimony — request for instructions — denial improper

Where the evidence was sufficient to permit a finding that a witness was an accessory before the fact to the offense of robbery and murder, the trial court erred in failing to comply with defendant's request that the judge charge the jury to scrutinize the witness's testimony, even though defendant withdrew the request, since the withdrawal resulted from pressure by the trial court to do so.

APPEAL by defendant from Cohoon, J., September 3, 1973 Session, NEW HANOVER Superior Court.

The defendant, Christopher Spicer, was charged by grand jury indictments with the armed robbery and murder of Donnie P. Christian. The indictments allege the offenses were committed in New Hanover County on April 5, 1973.

After the defendant's arrest on the charges, the court, upon a showing of indigency, appointed Mathias P. Hunoval attorney for the defendant.

Before arraignment, defense counsel made written motions for a bill of particulars, for discovery, for speedy trial, for a jury from another county, to dismiss for failure of the State

to hold a preliminary hearing, and to grant the defendant a severance from the cases involving Isaac Monk. After hearing on the motions, the court allowed in part the motion for a bill of particulars and for a severance, denied the motion to dismiss, and ordered a venire from Sampson County.

At the September 4, 1973 Session, New Hanover Superior Court, the defendant, Christopher Spicer, was arraigned on bills of indictment charging armed robbery and murder and thereto entered pleas of not guilty. The charges were consolidated for trial. A jury from a Sampson County venire was selected and empaneled. The defendant made and the court denied a motion that the witnesses be sequestered.

The State introduced evidence in material substance as follows: On and prior to April 5, 1973, Donnie P. Christian was Vice President and Office Manager of Christian Foods, Incorporated, a distributor of poultry and restaurant supplies. The place of business was located in the outskirts of Wilmington. The work force consisted of sixteen or seventeen employees. At the close of each work day, Donnie P. Christian placed the cash receipts in a metal box, closed the building, and left the grounds which were surrounded by a woven wire fence. He closed and locked the gate to the enclosure. Usually the cash receipts and checks for that day were taken in the metal box to his home for deposit in the bank the following day.

On April 5, 1973, all employees left the plant at the usual closing time except Donnie P. Christian who remained in the office. At about nine o'clock in the evening, Donald Lee Christian, father of Donnie P. Christian, went to the plant and found his son's automobile at the gate. The lights were on and the motor was running. His son's body was on the ground beside the automobile. The gate was almost closed, but not locked. Donnie was lying in a pool of blood. Pathological examination disclosed a bullet wound under one armpit. The bullet had penetrated the body and lodged under the opposite armpit. The metal box which Donnie customarily carried home on leaving the plant was missing. Examination disclosed the day's receipts consisted of $2,396.51 in cash and $1,697.86 in checks. Donnie was known to have two $100 bills in his pocket for the purpose of paying for a C.O.D. shipment of parts for his automobile.

Detective Howell of the Sheriff's Department examined the area near the gate to the enclosure surrounding the plant. He

discovered automobile tracks in a mud hole near the gate. He made a cast of the automobile tracks which clearly showed the imprint of the tire tread.

Lammuel Rouse, who operated a body and radiator repair shop, testified that on April 12th Isaac Sherill Monk brought a 1968 Chevrolet Impala to his shop for repairs. In the trunk was a used tire. Officers took possession of this tire, examined it, and removed dirt from it. The soil expert testified that the dirt removed from the tire was of the same type and character as the soil in and around the mud hole where the tire track was discovered outside the Christian plant. The witness who made the cast of the track at the mud hole testified that the tread of the tire from Monk's car exactly fitted the imprint made of the track at the mud hole.

On April 16, 1973, Officer Pickler went to the home of the defendant, Christopher Spicer, to serve a warrant of arrest for the robbery. He had a search warrant for narcotics. On a table in Spicer's home he found one $100 bill, three $20 bills, two tens and two fives. He found some .22 long rifle cartridges, some .32 pistol cartridges, and one .308 military cartridge, and some loaded shotgun shells in a bowl in Spicer's house.

Larry Fox testified he saw the defendant and Monk together at 7 o'clock p.m. on April 5, 1973, in Wilmington.

Bertie Brailford testified that he worked at Christian Foods, Inc. Three or four weeks prior to April 5, 1973, Sam Taylor came to his house. "He wanted to borrow some money. . . . [H]e sat down and started talking, and he said that he was up tight for money. So I jokingly said, 'Well, I know where you can get a couple or three thousand dollars . . . if you wanted to.' And he said, 'How?' I told him where I worked and everything, and we went on to discuss about the money, about how my boss came out with the money at night alone. . . . I told him my boss came out of the place at night alone at dark and that he would come out of the gate . . . and lock the gate behind him. . . . Christopher Spicer came by my house looking for Sam. . . . Sam said [addressing the defendant Spicer], 'I want you to listen to what he has to say about where he works.' . . . I told him I worked for Christian Foods. . . . I told him that it was located on North Kerr Avenue . . . and that my boss would come out, usually it was dark . . . . He would be alone, that he would have the money with him . . . . Yes, I told him the money was

in a cash box . . . . I told him my boss would have 2 or 3 thousand dollars. . . . [H]e asked me would he be alone or would he have a gun. I told him no. . . . I told him no, not to my knowledge he didn't have a gun."

Brailford signed a written statement for the police containing the following: "I told Sam that I knew where he could get a couple or three thousand dollars, but I would have to get my cut out of it. Sam asked me how and where and I told him about Donnie Christian leaving the plant at Christian Poultry each night with the cash box containing the money from the daily sales." On cross-examination, Brailford admitted he signed a statement containing the above quoted section. "Yes, this conversation was still a joke . . . ."

Apparently as a result of Brailford's story, the defendant and Monk were charged with robbery and murder.

The State's witness Charles Edward Pennington testified that he was a prisoner for four days in the Wilmington jail charged with robbery (an unrelated offense). He was held in default of $5,000.00 bond. He was placed in the bullpen which was a screened-in section of the jail containing six cells, each with single bunks attached to the wall. During the time Pennington was in jail, he sent for Officer Howell and offered to help him uncover dealers in narcotics. During a conversation, Pennington told Officer Howell that he and the defendant Spicer, his cell mate, had a discussion in which the defendant said: "I was arrested for criminal robbery." "I [Pennington] asked, 'Who was you supposed to have robbed?' And he made some mention of a poultry house. And I said, 'Did you do it?' And he said, 'We did it.' "

On cross-examination, Pennington admitted that, without effort on his part, bond was reduced from $5,000.00 to $400.00 and he was released after he had talked to Officer Howell. When asked why the bond was reduced, he said: "I know nothing at all about it."

The jury was excused and the following appears from the record: On cross-examination the witness Pennington said: "No sir; I am not employed right now. The New Hanover County Sheriff's Department does not pay me a salary. No, sir; they aren't paying for rent on my apartment."

The following also appears from the record: "(It is hereby stipulated by both parties to this appeal that Pennington, along

with his wife and brother, were being held in protective custody in a residence in New Hanover County by New Hanover County Sheriff's Deputies at county expense as a prospective witness for the State in several drug cases.)" The above stipulation was not before the jury. It was entered as a stipulation *by both parties to this appeal.*

After the jury returned, defense counsel continued the cross-examination:

"Q. In January what was your wife doing for a living?

"MR. STROUD: Objection.

"THE COURT: Sustained.

"EXCEPTION No. 61

\*   \*   \*   \*   \*   \*

"Q. How are you being sustained? How are you clothing yourself?

"MR. STROUD: Object.

"THE COURT: Sustained.

"EXCEPTION No. 62

"Q. Who is paying for your room and accommodations or rent accommodations?

"MR. STROUD: Objection.

"THE COURT: Sustained.

"EXCEPTION No. 63

\*   \*   \*   \*   \*   \*

"Q. During the days that you had the money can you tell us how you acquired that money?

"MR. STROUD: Objection.

"THE COURT: Sustained.

"EXCEPTION No. 64"

At the conclusion of the State's evidence the court overruled a motion to dismiss.

The defendant introduced two witnesses who were confined in the bullpen during the four days the witness Pennington

State v. Spicer

was a prisoner. Both testified that Pennington and the defendant were never cell mates.

The defendant also introduced two witnesses who testified that shortly before Spicer's arrest, one of them paid him $85.00 by giving him a $100 bill and taking $15 in change.

Mrs. Spicer testified that at the time her husband was arrested she and her husband were both working. When the officers came to make the arrest she and Christopher were getting together their money for her to use in paying her tuition which was due at the Miller-Motte Business College which she was attending.

At the conclusion of the testimony, defense attorney requested the court to instruct the jury to scrutinize the testimony of accomplice Brailford. After the request was made, the court, defendant, and defense counsel held a conference which is a part of the record and here quoted in full:

"MR. HUNOVAL: I would in addition to what I have orally told the Judge and he has agreed to instruct on, I also request a cautionary instruction regarding accomplices and codefendants.

"THE COURT: Now let me see if I understand you. Do I understand you, Mr. Hunoval, that your defendant requests that the Court's instruction be, or rather, the Court advise the jury in its instructions that the defendant is charged in an additional offense of conspiracy to rob along with the witness Brailford and that your client desires the Court to instruct the jury as to Brailford being an accomplice. Is that what you are asking?

"MR. HUNOVAL: I am withdrawing the request, your Honor.

"THE COURT: The request is withdrawn. I think you have done the right thing, but I am not going to have a defendant tell his attorney to insist on something to go in the record and take the benefit of it and on the other hand turn around and won't say he didn't request it. Now you do not want it in the record to charge with reference to an accomplice or inform them you are charged with Brailford in a conspiracy to rob?

"DEFENDANT: Your Honor, I don't quite understand exactly what this is all about.

"THE COURT: Your attorney understands.

"DEFENDANT: Well, he hasn't explained it to me.

"THE COURT: I understand his request was made because you requested it, not making the request himself primarily.

"MR. HUNOVAL: Your Honor, may I state something for the record and then Mr. Spicer can say whatever he likes to say. Your Honor, I am familiar with the charge of the Court regarding accomplices and codefendants testimony. I informed Mr. Spicer about this prefactory [sic] language that you could use. I also advised him that the Court would have to apprise the jury that there was a charge involving conspiracy.

"THE COURT: Against him if I charge the jury with respect to Brailford being an accomplice.

"MR. HUNOVAL: And then I said, 'There are advantages to having that charge.' The disadvantage, of course, would be the linking—

"THE COURT: Bring before the jury another charge.

"MR. HUNOVAL: And that is why I approached the bench.

"THE COURT: Do you agree now with your attorney of withdrawing the request for the Court to make that instruction?

"DEFENDANT: Can I confer with him for a moment?

"THE COURT: Yes, you can confer with him.

"MR. HUNOVAL: Your Honor, after again talking with my client, my client has reached the conclusion that he would like you to charge in that fashion and he knows that—

"THE COURT: Do I understand your client desires that I instruct the jury that to consider Brailford as an accomplice, if they find he is an accomplice on the charge of conspiracy to rob, your defendant being charged with that same offense?

"MR. HUNOVAL: Your Honor, maybe I am laboring under a misinterpretation of what the law is. But it is my understanding that the charge you would give regarding an accomplice's testimony would be that an extra caution has to be—

"THE COURT: Now wait a minute. An accomplice— Actually Brailford is no accomplice in this case.

"He is not charged with robbery. He is not charged with murder that this man is charged with. He is not an accomplice in this case.

"(Both parties to this appeal stipulate that both Spicer and Brailford were charged with 'conspiracy to commit common law robbery'; and further that Spicer was not placed on trial in this case on that charge—he was on trial only upon the charges of murder and armed robbery.)

"MR. HUNOVAL: Well, your Honor, I would take a different position right or wrong.

"THE COURT: I just want to know. The only way I could instruct on this Brailford it would run the risk of advising the jury that this man is also charged with that offense. Otherwise, he is not an accomplice, which is detrimental, prejudicial to this defendant; and, therefore, I'll not charge upon that because it is detrimental and prejudicial to him and as a lawyer you know it is, and as a lawyer you have already requested that he not be charged upon it. You are only stating now what a defendant says about it.

"MR. HUNOVAL: Your Honor, he doesn't want that charge.

"THE COURT: Is that correct? You do not?

"DEFENDANT: Yes, sir.

"THE COURT: You have finally consented to the right course."

At the conclusion of the court's charge, the jury returned these verdicts: On the charge of robbery with firearms, "We find the defendant guilty as charged." On the charge of murder, "[T]hat Christopher Spicer is guilty of murder in the first degree as charged." The poll of the jury verified the verdicts as above recorded.

The court arrested the judgment on the robbery charge and imposed a death sentence on the charge of murder in the first degree.

The defendant excepted and appealed.

*Robert Morgan, Attorney General, by Charles M. Hensey. Assistant Attorney General and C. Diederich Heidgerd, Associate Attorney, for the State.*

*Chambers, Stein, Ferguson & Lanning by Adam Stein for defendant appellant.*

HIGGINS, Justice.

When this Court reverses a conviction on account of the insufficiency of the evidence, the custom is to recite the full substance of the testimony and point out why, in its totality, it is insufficient to support a verdict. However, when a new trial is ordered on account of the erroneous admission or exclusion of evidence, the custom is to recite only so much of the testimony as is necessary to disclose the legal basis for the decision, leaving the trial court at the new trial uninhibited as to other matters.

[1] In this case the trial judge sustained the State's objection to the repeated efforts of defense counsel to find out who was paying the living expenses of the defense witness Pennington and his wife with whom he lived. Pennington testified that the defendant admitted "We did it." He testified the admission was made while he and Spicer were cell mates in the bullpen of the jail. Two inmates testified Spicer and Pennington were never cell mates during Pennington's four day stay in the prison. Someone had procured a bond for Pennington which was reduced from $5,000.00 to $400.00. Pennington claimed not to know who made the arrangements for the reduction. Defense counsel, by cross-examination, sought to find out who was supporting State's witness Pennington and his wife, neither of whom was working. The purpose was to discover to whom the witness was indebted for such favors and to ascertain to what extent the favors colored his testimony against Spicer.

"The cross-examiner is allowed great latitude in questioning a witness to ascertain his motive for testifying. This is particularly true where the defendant is cross-examining a witness for the prosecution who is a codefendant or accomplice, or who is a person threatened with criminal prosecu-

tion for an independent crime, whose testimony against the defendant may be motivated by a promise or hope of immunity or leniency.

"A witness for the prosecution may also be cross-examined to ascertain whether his testimony was motivated by an expectation or hope of pecuniary gain; . . . " Wharton's Criminal Evidence, Vol. 2, 13th Ed., § 435, 352-354.

This Court's language in *State v. Roberson*, 215 N.C. 784, 3 S.E. 2d 277, is pertinent: "Cross-examination would be of little value if a witness could not be freely interrogated as to his motives, bias and interest, or as to his conduct as connected with the parties or the cause of action. . . . The defendant had a right to have the jury informed as to these matters and to debate before the jury the effect of such circumstances upon the credibility of the witness."

By Assignment of Error XIII, Exception No. 94, the defendant challenges the court's failure to instruct the jury concerning its duty to evaluate accomplice's testimony. The purpose of reciting the full discussion on this question is to disclose the circumstances under which the defendant finally agreed to withdraw the request. The withdrawal occurred only after the court made the inquiry and was assured by counsel that he desired the instruction as to Brailford's testimony. "THE COURT: Now wait a minute. An accomplice—Actually Brailford is no accomplice in this case." True, Brailford was not charged as an accomplice in the murder case, but his evidence permitted the jury to make a finding that he was an accomplice either in the robbery or the murder or both. Then the court should have instructed the jury as to such accomplice's testimony. The court should have, but failed to charge that if the jury found that Brailford was an accomplice, the jury should scrutinize his testimony with care and caution.

"While the court is not required to give the instruction in the exact language of the request, if request be made for a specific instruction, which is correct in itself and supported by evidence, the court must give the instruction at least in substance." *State v. Hooker*, 243 N.C. 429, 90 S.E. 2d 690; *State v. Pennell*, 232 N.C. 573, 61 S.E. 2d 593; *State v. Booker*, 123 N.C. 713, 31 S.E. 376.

"It bears against a witness that he is an accomplice in the crime and he is generally regarded as interested in the event."

*State v. Hale,* 231 N.C. 412, 57 S.E. 2d 322. *State v. Roberson, supra.*

Failure to give the requested instructions when justified is reversible error. *State v. Bailey,* 254 N.C. 380, 119 S.E. 2d 165.

The record discloses that the State's witness Brailford made the admission to the officers, "I stated that I initiated the proposition concerning the hit of Christian Brothers Poultry. It was my idea." He again stated he expected his cut. Surely this participation would warrant the jury in finding Brailford was an accomplice in the robbery. The charge is required when requested if the accomplice is indicted as, or found by the jury to be, an accomplice. *State v. Booker, supra.* A witness is an accomplice within the rules relating to accomplice's testimony if he is "a principal, as an aider and abettor, or as an accessory before the fact." *State v. Bailey, supra.*

An accessory before the fact is defined by this Court in *State v. Bass,* 255 N.C. 42, 120 S.E. 2d 580, in this way: " 'The concept of accessary before the fact has been held to presuppose some arrangement with respect to the commission of the crime in question . . . . To render one guilty as an accessary before the fact to a felony he must counsel, incite, induce, procure or encourage the commission of the crime, so as to, in some way, participate therein by word or act. . . . It is not necessary that he shall be the originator of the design to commit the crime; it is sufficient if, with knowledge that another intends to commit a crime, he encourages and incites him to carry out his design. . . . ' "

The evidence discloses that the witness Brailford originated the plan to rob his employer and explained the setup at the plant. Brailford testified the defendant came by his house "the last of the week preceding the robbery" and talked to him out on the porch. "He asked me if things were still set up the same way as before at the plant. I told him that they were and he told me that he was going to hit the dude." (Brailford claimed he was joking. He neglected to explain the joke in time to save the life of the man for whom he worked.)

[2] The record discloses evidence sufficient to permit a finding that Brailford was an accessory before the fact to the offense of robbery and murder. At least the evidence was sufficient to require the court to comply with the defendant's request to

charge the jury that upon a finding Brailford was an accomplice, the law required the jury to scrutinize his testimony.

The able and painstaking trial judge in this case, with the best of intentions no doubt, succeeded in pressuring the defendant and his counsel into withdrawing the request for an appropriate instruction with respect to the testimony of the accomplice Brailford. Obviously the judge held the mistaken view that one must be charged by indictment as an accomplice in order to give the accused the benefit of the rule. When requested, the instruction must be given if the jury should find from the evidence that the witness was an accomplice. The trial judge obtained the withdrawal of the request by explaining to the defendant and his counsel that the witness Brailford was not an accomplice. We think the trial judge, because of his mistaken view of the law, exercised too much pressure to make the withdrawal of the request voluntary on the part of the defendant and his counsel.

[1] We conclude the able trial judge should have permitted defense counsel more latitude in finding out by cross-examination how the witness Pennington and his family maintained themselves. The answer might disclose the advantage the witness expected in return for his testimony.

In *State v. Hart*, 239 N.C. 709, 80 S.E. 2d 901, this Court said: "As a consequence, the law decrees that 'any evidence is competent which tends to show the feeling or bias of a witness in respect to the party or the cause,' and that jurors are to consider and weigh evidence of this character in determining the credibility of the witness to whom it relates." If a witness has an interest which may cause bias, the source of the interest is a proper subject of inquiry on cross-examination.

The evidence disclosed that at the time of his death Donnie P. Christian was twenty-seven years of age, six feet tall and weighed one hundred and eighty pounds. His resistance to robbery could not be unexpected. Brailford originated the plan for the robbery. He explained the layout and immediately before the hit, gave assurance the setup at the plant was unchanged.

We conclude the trial court committed error, (1) by sustaining the State's objection to the cross-examination of the witness Pennington as challenged by Assignment of Error III (A), Exceptions Nos. 62, 63, and 64; and (2) by failing to caution the jury to scrutinize the testimony of the State's wit-

ness Brailford if the jury found him to be an accomplice. Assignment of Error XIII, based on Exceptions Nos. 90, 91, 92, and 93.

The perpetrator of this brutal killing and robbery deserves the maximum punishment authorized by law. As a corollary the courts must see to it that the legal rights are accorded to the accused before a conviction is permitted to stand.

For the errors assigned, the defendant is entitled to go before another jury.

New trial.